UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELISSA MIDWEST aka
MELISSA HARRINGTON, MELTECH, INC.,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

        - versus -

IAC/INTERACTIVECORP., MATCH.COM,
LLC, PEOPLE MEDIA, LLC., and HUMOR
RAINBOW, INC.,

                    Defendants.

Case No. 13-CV-8351

Judge Furman



JURY TRIAL DEMAND

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Melissa "Midwest" Harrington and MelTech, Inc., by their undersigned attorneys, file this amended class action complaint against Defendants in response to Defendants' November 2013 media publications and in accordance with FRCP 15(a)(1). Plaintiffs' allegations are based upon an extensive investigation that included and continues to include: (1) reviewing thousands of complaints against Defendants, (2) analysis of thousands of fraudulent profiles posted on Defendants' web sites, (3) consultations with experts throughout the U.S. in romance scams, statistics and pattern recognition, computer/internet technology, and photograph recognition software, (4) consultations with the nation's top class action attorneys and law firms; (5) review of recent warnings regarding online dating from the FBI, U.S. Embassy in Ghana, U.S. Army, and Colorado Attorney General; and (6) confidential information provided by industry professionals regarding Defendants' criminal activity. Plaintiffs have provided legal and factual substantiation for its complaint and are in possession of substantial evidence in support of the allegations set forth herein.

* original Plaintiff was harassed and defamed after filing the original lawsuit and withdrew as a class representative thereafter

## NATURE OF THE ACTION

1.      This action arises out of the biggest fraudulent enterprise ever executed on the internet by a publicly traded American corporation.

2.      Since at least 2007, Defendants IAC/INTERACTIVE CORP., Match.com, LLC, People Media, LLC, Humor Rainbow, Inc. (hereinafter "Match"), have committed large-scale violations of the Federal Lanham Act, violations of Civil RICO, Federal Copyright Infringement, violations of New York Civil Rights Law Sections 50 and 51, and other Fraudulent and unlawful conduct through their "Match Segment."

3.      Attached as Exhibit "A" are approximately 117 consumers' complaints regarding fake profiles and fraudulent activity occurring on Match during the class period.  Plaintiffs have received thousands of similar complaints of which at least hundreds arise from Match.com and its network of web sites.

4.      Match's illegal and criminal business practices arise from the knowing and intentional unauthorized use of Plaintiffs' photographs in thousands of fraudulent profiles over the past six years that were developed, published and disseminated to millions of people around the world on Match's dating sites, representing to the public and its subscribers that Melissa Midwest was and is a member of Match's web sites, along with thousands of other models, military servicemen, and others who were never members of Defendants' online dating web sites.

5.      Melissa's fake profiles, and those of the proposed class, are the reason most people join or re-subscribe to Match's 25 dating sites, and are accountable for the majority of time members/subscribers spend on Defendants' sites.

6.      MelTech, Inc., the owner of Melissa Midwest's copyrighted photographs, has received thousands of complaints from American romance scam victims over the past six-plus

years, including hundreds of victims who were defrauded out of millions of dollars as a result of fake profiles on Match.com and Defendants' People Media web sites.

7.      While Match masquerades as the premiere dating site network in the United States, the reality is that the majority of profiles posted are fraudulent profiles created by Match and third-parties including the Yahoo Boys in Nigeria and Ghana for fraudulent purposes, including photographs of Melissa Midwest and other models.

8.      Match.com's CEO told an industry insider years ago that he does not care where his company's profiles come from because more profiles increase profits and because their company is protected from lawsuits by their Terms of Use agreement.

9.      Online dating fraud has reached epidemic proportions in the U.S. and around the globe, and Match's sites are among the top offenders as the increase in fake profiles has increased profits, nearly tripling the annual gross revenue in the class period to $750 million last year.

10.     Days after this lawsuit was filed Defendants announced plans to spin off its Match Segment into a separate entity in an apparent attempt for the parent company to avoid civil and criminal liability in this case.

11.     On February 14, 2013, the San Diego Division of the FBI issued press release entitled: "Looking for Love? Beware of Online Dating Scams." (Exhibit "B").

12.      Exhibit "C" is a warning from the U.S. Embassy in Ghana which states: "United States citizens should be alert to attempts at fraud by persons claiming to live in Ghana who profess friendship or romantic interest over the internet."

13.     Exhibit "D" is a U.S. Army warning regarding "Online Romance Scam Information"

14.     Exhibit "E" is a press release from the Colorado Attorney General entitled: "Sweetheart Scams Sweep Nation."

15.     Exhibit "F" are articles regarding the recent arrests of the Yahoo Boys in Nigeria and the United States.

16.     Match is aware of this fraud and is an active participant, as their computer servers in the United States, receive and approve fraudulent profiles that "ping" from international IP addresses and notorious proxy servers, which have the computer equivalents of area codes, in addition to receiving thousands of consumer complaints regarding fake profiles and fraudulent activity during the class period.

17.     Proof of Defendants' knowledge will be revealed through witness testimony, internal memorandums, letters, emails, and other confidential company correspondence as fake profiles on Match are an essential part of their business model.

18.     Furthermore, Match specifically approves, edits content, crops photographs, scrubs meta-data, posts every profile, and charges approximately $40 per month for membership, which constitutes and characterizes Match as an information content provider, as opposed to an information service provider.

19.     Match, its subsidiaries, joint venturers, and/or subcontractors, also develop, originate, create, and perpetuate false and/or non-existent profiles featuring photographs of Plaintiff and members of the class, as well as operating fraudulent profiles.

20.     Match also generate millions of fraudulent electronic correspondences on behalf of fake profiles featuring photographs of Plaintiff and members of the class, in the form of "winks," emails, "daily matches," and other correspondence which falsely and fraudulently

advertise and depict Plaintiff and members of the class as genuine members of Defendants' dating sites that are interested and available to meet their "match."

21.     Match also fraudulently depicts that these fake profile are "active now," or "active within 1 day," or "active within three weeks," when this information is entirely inaccurate and designed to deceive consumers.

22.     Attached as Exhibit "G" is a is a page from www.scamdigger.com which includes the top 10 women featured in fake online dating profiles, including a photograph of Plaintiff Melissa Midwest (first column, second row), a list of approximately 165 fake Match.com profile usernames where Ms. Harrington's photographs are used, nine examples of fake People Media profiles with Ms. Harrington's pictures, and excerpts from the web site www.stop-scammers.com regarding Plaintiff.

23.     Melissa Midwest www.melissamidwest.com is a public figure whose likeness and image have substantial commercial value and is widely known as she has appeared in 38 magazines and was once one of the top ten most searched women on the internet.   However, the Defendant Match has knowingly and intentionally approved thousands of dating profiles on their 25 web sites for the past six years with stolen photographs of Ms. Harrington, falsely depicting her as a bona fide Match subscriber.

24.     While Ms. Harrington is the most famous of all men or women whose photographs have been used consistently in fake Match dating profiles, she is only one of thousands of men and women whose likeness and image have been hijacked by Defendants and used as avatars in fake profiles.

25.     Attached as exhibit "H" is a list of approximately 180 fake Match.com profile usernames including photographs of Cassandra "Princess BlueEyez," along with examples of

fake Match and People Media profiles in which she is featured (Exhibit "G" - Scamdigger Top 10 - first column, first row).

26.     Attached as exhibit "I" is a list of approximately 121 fake Match.com profile usernames including photographs of a Raven Riley (*see* Wikipedia) along with examples of fake People Media profiles in which she is featured (Exhibit "G" - Scamdigger Top 10 – first row, second column).

27.     Attached as exhibit "J" is a list of approximately 91 fake Match.com profile usernames including photographs of Lana Brooke who also appears in several attached fake profiles, most recently on or about 11/30/2013 (Exhibit "G" - Scamdigger Top 10 – first column, third row).

28.     Attached as exhibit "K" is a list of approximately 164 fake Match.com profile usernames including photographs of Megan QT who also appears in several of the fake People Media attached hereto. (Exhibit "G" - Scamdigger Top 10 – second column, third row).

29.     Attached as Exhibit "L" is a fake Match.com profile featuring Ann Angel published on 11/30/13, nine days after the original lawsuit was filed, plus three additional fake profiles featuring Ms. Angel who appears in hundreds if not thousands of fake profiles approved and posted on Defendants' web sites during the class period (Exhibit "G" - Scamdigger Top 10 – first column, fourth row).

30.     Attached as Exhibit "M" is a list of fake profile usernames featuring Kelsey, along with two examples of fake profiles.  Kelsey appears in hundreds if not thousands of fake profiles approved and posted on Defendants' web sites during the class period (Exhibit "G" - Scamdigger Top 10 – second column, fourth row.)

31.     Attached as Exhibit "N" is a fake Match.com profile of Josie "Model," posted on or about 11/30/13, nine days after the original lawsuit was filed and a fake People Media profile. Josie appears in hundreds if not thousands of fake profiles approved and posted on Defendants' web sites during the class period (Exhibit "G" - Scamdigger Top 10 – third column, second row).

32.     Attached as Exhibit "O" are fake profiles of "Next Door" Nikki, posted on Defendants' web sites during the class period. Nikki appears in hundreds if not thousands of fake profiles approved and posted on Defendants' web sites during the class period (Exhibit "G" - Scamdigger Top 10 – second column).

33.     Attached as Exhibit "P" is a list of approximately 1,084 fake profile usernames created with computer software on Match.com. These profiles contain identical sentences with repeated misspellings rearranged and posted with different photographs of class members in different cities. Roughly half the member names contain sequential numbers at the end from 1 – 99, and each profile names obscure destinations under the title "Favorite Hot Spots."

34.     Attached as exhibit "Q" are lists of approximately 997 fake Match.com profile usernames of Jane Does and John Does yet to be identified. These fake profiles are recognized through the repeated use of the same photographs in different profiles and recurring language and phrases in different profiles.

35.     Hollywood celebrities are among those included in fake profiles on Match.com, including but not limited to: algo36, ready2goalready, jessica4366, bluesaphira67, and nihowmei, which include photographs of Al Pacino, Lindsey Lohan, Rob Lowe, Jessica Biel, and Jimmy Smits, demonstrating that Match fails to screen its photographs and profiles.

36.     Match has developed, approved and published hundreds if not thousands of fake profiles containing the phrase "AbleAction" with an added number as the username.

37.    Match has approved and published hundreds of fake Male profiles containing the phrase: "Character is worth more than flashiness."

38.    Fake profiles also include photographs pirated from Google images, Facebook and modeling agencies, business web sites and stock photos, as well as photographs of military servicemen and women.

39.    Once fake profiles with these photographs are approved, they are used in Match advertising, including daily emails to millions of subscribers and potential subscribers.

40.    Defendants have engaged and continue to engage in Willful Blindness by developing, approving, and posting copyrighted and non-copyrighted photographs of Plaintiff and members of the class on their web sites for commercial gain.

41.    Unknown thousands or millions of members subscribe to Match's web sites in the hope of meeting Plaintiff and members of the class, who are not and never were members of Defendants' web sites.

42.    Fake profiles removed from Match after being posted yield the following message when members/subscribers attempt to contact such individuals: "The profile you're looking for is not available. Instead take a look at these" or "Ooops, the profile you are looking for is unavailable please try another."

43.    Plaintiffs have received numerous complaints from current and former subscribers of Match.com claiming that up to 95% of the time they attempt to contact a member, the message contained in the prior paragraph appears.

44.    Among other torts and crimes committed by Defendants, Plaintiffs and the class are used as part of an illegal bait and switch advertising scam, where Match publishes photographs of models and other attractive people with falsely inflated incomes and false

religious proclamations to obtain new members and encourage current members to renew their subscriptions, when in fact Match knows such photographs are not true depictions of members.

45.     According to a Match.com/Liberty Advertising 2011 report, Match claims to "engage 2.7 million Match.com users who connect online... with users who spend an average of 83 minutes per month on the site." These numbers, largely created through the use of Plaintiffs' and class member photographs, are accountable for millions of dollars in advertising revenue to Defendants.

46.     American victims of internet fraud (including romance fraud and identity theft), estimated to be at least thousands, mostly widows, widowers, and divorces age 40 and over, have been defrauded out of billions of dollars (according to 419.bittenus.com) through fraudulent dating profiles on Defendants' sites, and those of its competitors.

47.     Stop-Scammers.com has a data base of 75,938 photographs from 15,331 reports of scammers and features Melissa Midwest's photograph on the home page as one of the most frequently used images in fraudulent profiles.

48.     Romancescams.org has had over 59,000 members since 2005 with 5,529 scammers reported, 10,502 photos posted (including Melissa Midwest), and 1813 victims reporting romance fraud losses totaling nearly $26 million, approximately $15,000 per victim, many of which were victimized on Match's sites.

49.     The FBI estimates that the average romance fraud victim is defrauded out of $15,000 - $20,000, with cases ranging from a couple hundred dollars to hundreds of thousands of dollars, per victim.

50.     In addition to the financial and emotional toll, these scams destroy relationships, families, and result in suicides, abductions and murder of victims in foreign countries.

51.     Since 2005, web sites including Stop-Scammers.com, RomanceScam.com, RomanceScams.org, Internet-Love-Scams.org, 419.bittenus.com, Delphifaq.com, etc. have been founded in an effort to stop or curb the proliferation of fraudulent activity occurring by and through fraudulent profiles on internet dating web sites.

52.     These consumer assistance sites make available tens of thousands of photographs that are used in fraudulent profiles on Match's web sites, including photographs of Plaintiff and members of the class, which Match fails to use to screen unauthorized photographs.

53.     Match could easily and inexpensively stop these illegal practices through the implementation of photograph recognition software which can scan billions of images nearly instantaneously to maintain the integrity of its web sites (*see* www.tineye.com), through IP address screening of international IP addresses (and to stop a single IP address from creating multiple profiles), and through manual and software screening of profiles that have "red flags," but Match refuses to do so as these fake profiles are what make it such a commercial success.

54.     While previous consumer class actions and individual actions against Match have been dismissed, in those cases Plaintiffs were consumers who executed Terms of Use Agreements that absolved Defendants of liability.   In the present case, Plaintiffs Melissa Harrington and MelTech, Inc., as well as the proposed class, have never been members of Defendants' web sites and are not subject to these restrictive Terms of Use contracts.

55.     In addition, the present case arises out of the unauthorized use of Plaintiffs' likeness and image (intellectual property), whereas the prior Match case in Texas was to recover subscription fees for breach of contract and deceptive practices (by consumers) - different classes of plaintiffs, different causes of action, and different law governing the outcome of the case.

56.     Lastly, Defendants' immunity with regard to the Terms of Use agreement is not absolute as a recent court concluded in Illinois, refusing to dismiss a case against Match.com for accepting subscription fees from a convicted rapist who trolled Match's site with impunity until he found another victim.

57.     While it is anticipated that Defendants will argue that Section 230 of the CDA is a defense to their conduct, the creation of fake profiles, sending fake correspondence on behalf of fake profiles, and falsely depicting that phantom profiles are "active" is not immunized under the CDA: "(N)o case of which this court is aware has immunized a defendant from allegations that *it* created tortious content. Anthony v Yahoo Inc., 421 F Supp 2d 1257, 1262-63 [ND Cal 2006]

58.     "The CDA only entitles Yahoo! not to be 'the publisher or speaker' of the profiles. It does not absolve Yahoo! from liability for any accompanying misrepresentations. Because (Plaintiff) posits that Yahoo!'s manner of presenting the profiles... constitute fraud, the CDA does not apply. Anthony v Yahoo Inc., 421 F Supp 2d 1257, 1263 [ND Cal 2006]

59.     Furthermore, the immunity created by § 230(c)(1) is limited by § 230(e)(2), which requires the court to "construe Section 230(c)(1) in a manner that would neither 'limit or expand any law pertaining to intellectual property.' " *Gucci Am., Inc. v. Hall & Assocs.,* 135 F.Supp.2d 409, 413 (S.D.N.Y.2001) (quoting § 230(e)(2)).

60.     As a result, the CDA does not clothe service providers in immunity from "law[s] pertaining to intellectual property." *See Almeida,* 456 F.3d at 1322.  Perfect 10, Inc. v CCBill LLC, 488 F3d 1102, 1118 [9th Cir 2007]  Since Plaintiffs claims arise out of the unauthorized use of their likeness and image, intellectual property claims, CDA immunity does not apply.

61.     In addition, courts have found that "even if the data are supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer"

of the content (*Roommates.com*, 521 F.3d at 1171; *see also Accusearch Inc.*, 570 F.3d at 1199). Shiamili v Real Estate Group of New York, Inc., 17 NY3d 281, 292 [2011]

62.    The dictionary definitions for *develop* correspondingly revolve around the act of drawing something out, making it "visible," "active," or "usable." *Id.* Thus, a photograph is developed by chemical processes exposing a latent image. *See id.* ... Likewise, when confidential telephone information was exposed to public view through Abika.com, that information was "developed." *See id.* (one definition of *develop* is "to make actually available or usable (something previously only potentially available or usable)"). F.T.C. v Accusearch Inc., 570 F3d 1187, 1198 [10th Cir 2009]

63.    Match's acts of approving, publishing, and disseminating millions of fraudulent profiles created by the Yahoo Boys and others constitutes "development" within the meaning of the statute – unlike an internet message board where users post content for free without approval, Match's members pay approximately $40.00 per month for their service which specifically screens and edits each profile before publishing it to its current and potential members.  Creation of fake profiles in Nigeria and Ghana in internet cafes would be harmless but for Match's knowing and intentional "development" of these profiles through their modification, acceptance, approval, and circulation on their web sites in the United States and around the world.

64.    Even if the data (is) supplied by third parties, a website operator may still contribute to the content's illegality and thus be liable as a developer. Providing immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for "develop[ing]" unlawful content "in whole or in part." 47 U.S.C. § 230(f)(3). Fair Hous. Council of San F. Val. v Roommates.Com, LLC, 521 F.3d 1157, 1171 [9th Cir 2008]

65.    Defendants grossed approximately $750 million from its Match Segment in 2013 from these illegal practices and approximately $3 billion total during the six year class period, of which at least 50% is attributable to the unauthorized use of Plaintiff's photographs and those of class members.

66.    WHEREFORE, Plaintiff seeks to obtain equitable relief in the form of an order requiring Match to screen international IP addresses from posting domestic profiles in the United States, requiring Match to implement photograph and facial recognition software to effectively screen all photographs on their sites, requiring Match to engage in actual hands on screening of profiles before their approval, together with statutory damages, compensatory damages, treble damages, punitive damages, plus interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

67.    This court has jurisdiction pursuant to Section 43(a) of the Federal Lanham Act , Civil RICO under 18 U.S.C. Sec. 1962, the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202, as well as the Class Action Fairness Act as there are more than 100 class members and damages exceed $5 million.

68.    This court has personal jurisdiction over Defendants pursuant to 28 U.S.C. Sec. 1391(b)(2), as (a) a substantial portion of the wrongdoing alleged in this complaint took place in the State of New York; (b) Defendant IAC masterminded and perpetrated the unlawful conduct complained of herein, primarily, within New York from Defendant IAC's corporate office in Chelsea and Defendant Humor Rainbow, Inc. designates New York as its choice of forum; (c) Defendants regularly conduct and solicit business within New York including advertising; (d) Defendants engage in other persistent courses of conduct and derive substantial revenue from goods and services used or consumed within New York; (e) Defendants regularly and

systematically directs electronic activity within New York, manifest intent of engaging in business with New York, and are publicly traded on Wall Street; (f) Evidence of Defendants' wrongdoing is present in the State of New York; (g) Plaintiffs' likeness and image appears in fraudulent profiles posted in the State of New York; (h) Defendants are authorized to do business here and have sufficient minimum contacts with this state to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

69.     This court has supplemental jurisdiction over the State law claims asserted in this complaint pursuant to Title 18 U.S.C. Section 1367(a) as, "they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy…"

70.     Venue is proper in New York under 28 U.S.C. Sec. 1391 (c) because Defendant IAC's international corporate headquarters is located within this district at 555 18th Street, New York, New York (since April 6, 2007).

71.     IAC has been registered with the New York Secretary of State since March 31, 2005 and IAC's Registered Agent for service of process is National Registered Agents, Inc., Suite 501, 875 Avenue of the Americas, New York, NY 10001.

## PARTIES

72.     Plaintiff Melissa Midwest aka Melissa Harrington is an American citizen, model and public figure whose likeness and image have been used in thousands of fraudulent profiles created, developed, approved, posted, published, and disseminated on Match's web sites without consent.

73.     Plaintiff MelTech, Inc. is a corporation formed under the laws of the state of Nebraska.

74.     Defendant IAC/InterActiveCorp ("IAC") is a publicly traded Delaware corporation with corporate headquarters in the City and County of New York since April 2007 and approximately 150 subsidiary companies, including co-defendants People Media, LLC ("People Media"), Match.com, LLC ("Match"), and Humor Rainbow, Inc. ("Humor Rainbow").

75.     A subsidiary of IAC, People Media is a California limited liability company that operates approximately 25 online dating/personals web sites including, AsianPeopleMeet.com, BabyBoomerPeopleMeet.com, BBPeopleMeet.com, BlackBabyBoomerMeet.com, BlackChristianPeopleMeet.com, BlackPeopleMeet.com, CatholicPeopleMeet.com Chemistry.com, ChinesePeopleMeet.com, DemocraticPeopleMeet.com, DivorcedPeopleMeet.com, IndiaMatch.com, InterracialPeopleMeet.com, JPeopleMeet.com, LatinoPeopleMeet.com, LDSPlanet.com, LittlePeopleMeet.com, LoveAndSeek.com Match.com, MarriageMindedPeopleMeet.com, OKCupid.com, PetPeopleMeet.com, RepublicanPeopleMeet.com, SeniorBlackPeopleMeet.com, SeniorPeopleMeet.com, Singlesnet.com, and SingleParentMeet.com.

76.     A subsidiary of IAC, Defendant Match is a Texas limited liability company that operates the online dating/personals web sites Match.com and Chemistry.com.

77.     A subsidiary of IAC, Defendant Humor Rainbow is a New York corporation that operates online dating/personals web sites including OKcupid.com.

## CLASS ACTION ALLEGATIONS

78.     The class is initially defined as all individuals or entities including models, United States military servicemen/women, celebrities, social networking users, and others whose likenesses and images as depicted in photographs, that were approved, posted, published and

disseminated on Match and People Media web sites without the permission or consent of the person depicted in such photographs, since November 21, 2007.

79.     This action is properly maintainable as a class action.

80.     The class is so numerous that joinder of all members is impracticable.

81.     The number and identities of class members can be determined through various methods, including photograph identification software and other investigative techniques.

82.     The disposition of their claims in a class action will be of benefit to the parties and the court.

83.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this action as a class action.

84.     The likelihood of individual class members prosecuting separate claims is remote.

85.     There is a well-defined community of interest in the questions of law and fact involved affecting members of the class.  Among the questions of law and fact which are common to the class, and which predominate over questions affecting any individual class member are, the following:

(a)     Whether Defendants violated the Lanham Act by approving, posting, publishing, and disseminating, and otherwise using Plaintiffs' photographs in thousands of Defendants' dating profiles, intentionally "passing off" these non-members as subscribers or members of Defendants' web sites.

(b)     Whether Match violated Civil RICO by intentionally creating, approving, posting, publishing, and disseminating millions of fraudulent profiles on their web sites

16

depicting Plaintiff and members of the class without consent, and collecting billions of dollars in subscription and advertising fees for doing so.

      (c)     Whether Defendants committed copyright infringement.

      (d)     Whether Defendants violated New York Civil Rights Law Section 50 and 51 by approving and posting thousands of fraudulent dating profiles that incorporate the unauthorized use of Plaintiffs' likeness and image, as well as thousands of other class members.

      (e)     Whether Defendants acts constitute Conversion, Negligence, and/or Misappropriation.

      (f)     Whether Defendants' acts were willful entitling Plaintiffs class to treble and/or punitive damages.

      (g)     Whether Plaintiffs and the class are entitled to injunctive relief requiring Defendants to implement photograph recognition software and foreign IP address screening, to stop these illegal business practices.

86.     Plaintiffs are members of the class and are committed to prosecuting the action.

87.     Plaintiffs' claims are typical of the claims of the other members of the class.

88.     Plaintiffs do not have interests antagonistic to or in conflict with those they seek to represent.  Plaintiffs are, therefore, adequate representatives of the class.

89.     The likelihood of individual class members prosecuting separate individual actions is remote due to the relatively small loss suffered by most class members as compared to the burden and expense of prosecuting litigation of this nature and magnitude.  Absent a class action, Defendants are likely to avoid liability for their wrongdoing, and the class members are unlikely to obtain redress for the wrongs alleged herein.

90.     Adjudication of this case on a class-wide basis is manageable by this court.

## FACTUAL ALLEGATIONS

91.     Defendant Match owns and operates and has derived billions of dollars in gross revenue through subscription fees and advertising, from approximately 25 dating/personal web sites over the past 6 years, including Match.com, Chemistry.com, Singlesnet.com, AsianPeopleMeet.com, BabyBoomerPeopleMeet.com, BBPeopleMeet.com, BlackBabyBoomerMeet.com, BlackChristianPeopleMeet.com, BlackPeopleMeet.com, CatholicPeopleMeet.com Chemistry.com, ChinesePeopleMeet.com, DemocraticPeopleMeet.com, DivorcedPeopleMeet.com, IndiaMatch.com, InterracialPeopleMeet.com, JPeopleMeet.com, LatinoPeopleMeet.com, LDSPlanet.com, LittlePeopleMeet.com, LoveAndSeek.com, Match.com, MarriageMindedPeopleMeet.com, OKCupid.com, PetPeopleMeet.com, RepublicanPeopleMeet.com,  SeniorBlackPeopleMeet.com, SeniorPeopleMeet.com, Singlesnet.com, and SingleParentMeet.com.

92.     All of these web sites incorporate IAC intellectual property, including patents, trademarks, and copyrights, as well as IAC hardware, software, and other computer systems, and generate revenue for its parent company, IAC.

93.     IAC's sites advertise and promote for commercial purposes, IAC's subsidiary and partner companies, including, Expedia.com, Hotwire.com, etc. and obtain substantial revenue by the cross-promotion of these sites through its "Match Segment."

94.     While Match's sites presumably provide a legitimate forum for American citizens in the 50 states to meet new people for dating, relationships, and marriage, the truth is that the majority of profiles on these sites are fraudulent profiles posted by con-artists from international locations for illegal purposes, using the photographs of Plaintiffs and members of the class

without permission or consent, and fraudulent profiles created and operated by Match and/or its contractors, subcontractors, joint ventures, agents, and partners.

95.      Match knowingly receives subscription fees from criminals from foreign countries in the the form of credit/debit card payments to allow them to communicate with legitimate members through profiles with photographs of Plaintiff and members of the class.

96.      Match knowingly accepts fake profiles from notorious proxy servers established abroad or in the United States that are used to disguise the true origin of the profiles.

97.      Match knowingly allows these third-party criminals to post fake profiles with photographs of Plaintiff and class members that include contact information, including phone numbers and email addresses (in violation of Par. 9(f) of their Terms of Use agreement).  The purpose is so these criminals can receive contacts from Match members without paying for subscriptions while Match simultaneously increases their membership base to increase subscription and advertising revenue.

98.      Since at least November, 2007, Match's online dating/personals web sites have been inundated with fraudulent profiles created by individuals operating from computers with IP addresses outside the United States, in addition to those created and operated by Match and/or its partners, contractors, subcontractors, joint ventures, and agents.

99.      Match claims to have millions of members on its web sites, and claims to have 20,000 new members joining daily, but in fact, a majority of profiles posted on Defendants' web sites are fake or fraudulent profiles incorporating the likeness and image of Plaintiffs and members of the class without consent.

100.     Match has failed to use reasonable care in the manual approval process of profiles that contain the likenesses and images of Plaintiffs and members of the class, over and over again in profiles that are obviously fake or fraudulent, demonstrating willful blindness.

101.     Match has failed to respond promptly, and in many cases have not responded at all, to complaints regarding fake or fraudulent profiles incorporating the likenesses and images of Plaintiffs and members of the class.

102.     Defendants have failed to take legal action against the criminals who have openly operated on their web sites since at least November 21, 2007.

103.     Examples of fake profiles include those usernames in this amended complaint, approximately 3,000 in all, including over 200 of Plaintiff Melissa Midwest, plus examples of fake profiles.

104.     As a result of the foregoing, Defendants since at least November 21, 2007, have been engaged in large-scale violations of the Federal Lanham Act, violations of Civil RICO, Federal Copyright Infringement, violations of New York Civil Rights Law Sections 50 and 51, and other unlawful conduct through their "Match Segment," entitling Plaintiffs and class to compensatory and punitive damages.

## FIRST CAUSE OF ACTION

## FEDERAL LANHAM ACT VIOLATIONS

105.     Plaintiffs re-allege every paragraph set forth above as though set forth herein.

106.     Section 43(a) of the Lanham Act provides a federal cause of action for asserting unfair competition claims against confusing and deceptive advertising practices.

107.     Section 43(a) of the Lanham Act provides that: "any person who ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin

of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1)(B).

108. A plaintiff must allege that: (1) the defendant made false or misleading representations regarding the nature, characteristics, or quality of the plaintiff's services or commercial activities; (2) the representations were used in commerce; (3) the representations were made in the context of commercial advertising or promotion; and (4) the defendant's actions made the plaintiff believe it would be damaged by the representations. *Galerie Gmurzynska v. Hutton,* 257 F.Supp.2d 621, 629 (S.D.N.Y.2003), *aff'd,* 355 F.3d 206 (2d Cir.2004). <u>Verizon Directories Corp. v Yellow Book USA, Inc.,</u> 309 F Supp 2d 401, 404 [EDNY 2004]

109. The Second Circuit uses the "reasonable interest" test, pursuant to which a Lanham Act plaintiff must show (a) a reasonable interest to be protected against the alleged false advertising, and (b) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising.

110. The essence of Plaintiffs' claims are that the majority of profiles posted and approved on Match's sites, are actually the photographs of Plaintiff and members of the class, including models, businessmen, public figures, celebrities, military servicemen, and other non-members, who are "passed off" as genuine members by Match.

111. A reverse passing off claim requires the following allegations: (1) that the [product] at issue originated with the plaintiff; (2) that [the] origin of the [product] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship,* 380 F.3d 126, 131 (2d Cir.2004) (quoting *Softel, Inc. v. Dragon Med. & Scientific Commc'ns,* 118 F.3d 955, 970 (2d Cir.1997)). Levine v Landy, 832 F Supp 2d 176, 189 [NDNY 2011]

112.   "A section 43(a) claim may be based on practices or conduct "economically equivalent" to palming off. We find that appellant did state such a claim by alleging that defendants engaged in conduct amounting to "express reverse palming off." ... defendants not only removed appellant's name from all credits and advertising, they also substituted a name of their own choosing. Appellees' alleged conduct therefore amounts to express reverse passing off." Smith v Montoro, 648 F2d 602, 608 [9th Cir 1981]

113.   "The next question is whether there is a sufficient showing of likelihood of deception or confusion to bring the case within Section 43(a) of the Lanham Act. In this connection, the starting point is the fact that (defendant) and the others responsible for this film have deliberately attempted to cash in on the Dallas Cheerleaders' popularity and attracting power. Under such circumstances an inference of likelihood of confusion can readily be drawn." Dallas Cowboys Cheerleaders, Inc. v Pussycat Cinema, Ltd., 467 F Supp 366, 376-77 [SDNY 1979] affd, 604 F2d 200 [2d Cir 1979]

114.   15 U.S.C. § 1125(a)(1)(A)-(B). Claims under section 43(a) are styled as either false representation under subsection (A) or false advertising under subsection (B). Section 43(a) targets "actions like trademark infringement that deceive consumers and impair a producer's goodwill." *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 32, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). Thus, section 43(a) forbids, *inter alia,* "reverse passing off"—when a "producer misrepresents someone else's goods or services as his own." *Dastar,* 539 U.S. at 28 n. 1, 32, 123 S.Ct. 2041. Agence France Presse v Morel, 769 F Supp 2d 295, 307 [SDNY 2011]

115.    Similarly, in the present case, Defendants are deliberately attempting to cash in on the commercial value of Melissa Midwest and thousands of class members who are featured in millions of fake profiles posted on their web sites.  These circumstances also create a likelihood of confusion and fall within the province of the Lanham Act.

116.    Match falsely designates the origin of these photographs and the individuals depicted in them by designating towns, cities, and states in the United States as their place of origin, when the computers uploading these photographs are pinging from IP addresses thousands of miles away on different continents or from notorious proxy servers known to dispatch and broadcast criminal publications.

117.    Match falsely attributes Melissa's hometown, religion, ethnicity, income, and every other detail about her and her life through thousands of fake profiles posted on Defendants' web sites during the class period.

118.    Match also sends fraudulent electronic correspondence in the form of millions of emails, winks, matches, etc. to current, potential, and former subscribers which knowingly include fraudulent profiles with photographs of Plaintiffs and members of the class.

119.    Such profiles include but are not limited to the fake profiles and 3,000 fake usernames attached as examples hereto.

120.    Match has exploited the use of these photographs for commercial purposes without the permission or consent of Plaintiffs and members of the class.

121.    Match's acts have caused, and unless restrained, will continue to cause damages and irreparable injury to Plaintiffs and the class through the passing off of Plaintiffs and the class as genuine members on Defendants' sites.

122.    Match's acts have caused and continue to cause depreciation in the value and ability to license, sell, or otherwise commercially exploit their likenesses and images, lost profits and opportunities, and damage to their reputations.

123.    Match acted willfully or knew or should have known that their actions constituted violations of the Lanham Act.

124.    Plaintiffs and members of the class have suffered damages and are in imminent danger of suffering further damages from Defendants' unlawful practices.

125.    On its face, section 43(a) gives standing to sue to "any person who believes that he is or is likely to be damaged." *See* L'Aiglon Apparel Co. v. Lana Lobell, Inc., 214 F.2d 649, 651 (3d Cir. 1954) ("It seems to us that Congress has defined a statutory civil wrong of false representation of goods in commerce and has given a broad class of suitors injured or likely to be injured by such wrong the right to relief in the federal courts.").

126.    Plaintiffs and members of the class request compensatory damages in the amount of $1.5 billion, and punitive damages in the amount of $3 billion, together with attorneys' fees and the costs of this action.

## SECOND CAUSE OF ACTION

## CIVIL RICO – WIRE FRAUD (18 U.S.C. Sec. 1962(c) and (d))

127.    Plaintiffs re-allege every paragraph set forth above as though set forth herein.

128.    Title 18 U.S.C. Section 1962(c) states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…"

129.    Title 18 U.S.C. Section 1961(4) states: "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

130.    Title 18 U.S.C. Section 1961(5) states: "'pattern of racketeering activity' requires at least two acts of racketeering activity... within ten years."

131.    Title 18 U.S.C. Section 1962(d) states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

132.    Title 18 U.S.C. Section 1961(1) [Definitions] states: "racketeering activity" means... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1343 (relating to wire fraud)."

133.    Title 18 U.S.C. Section 1343 states: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits, or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both..."

134.    Courts have recognized a variety of means of communications as falling under the wire fraud statute, including facsimile, telex, modem, and internet transmissions. See, e.g., United States v. Pierello, 255 F.3d 728 (9th Cir. 2001) (affirming sentence of defendant who used the Internet to commit wire fraud).

135.    The "Match Segment," including Defendants and their partners, joint venturers, subcontractors, and agents, constitute an enterprise pursuant to Title 18 U.S.C. Section 1961.

136.   RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "In order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of [18 U.S.C] § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Svs., Inc.,* 271 F.3d 374, 380 (2d Cir.2001). Lerner v Fleet Bank, N.A., 459 F3d 273, 283 [2d Cir 2006]

137.   Defendants have engaged in a pattern of racketeering activity since November 21, 2007, through the date of the filing of this action, through millions of acts of wire fraud, occurring across state lines and international borders, including but not limited to inventing and operating computer systems that develop, create, post, publish and disseminate fraudulent profiles featuring unauthorized photographs of Plaintiffs and members of the class on Match's dating/personals web sites throughout the 50 states, knowingly approving fake profiles featuring photographs of Plaintiff and members of the class posted by third-party criminals, disseminating fraudulent correspondence on behalf of these fake profiles, and grossing billions of dollars in profits subscription fees and advertising revenue therefrom.

138.   Match facilitates, accommodates, and participates in wire fraud by representing that millions of profiles created from IP addresses in Africa and other international locations, were actually created in the United States and attributable to American citizens.

139.   While consumers on Defendants' web sites don't know where a member/subscriber is creating a profile, Defendants do know and fraudulently disguise the origin to inflate its membership base and increase advertising revenue.

140.    Match knowingly accepts subscription fees from criminals in international locations from individuals who use Defendants' web sites for illegal purposes, including romance scams and other consumer fraud.

141.    Match annually grosses approximately $750 million through their "Match Segment" (approximately $3 billion during the class period) as a result of this enterprise.

142.    Due to the fraudulent, criminal enterprise perpetrated by Defendants, Plaintiffs' class requests compensatory damages in the amount of $1.5 billion plus treble damages as permitted by statute, as well as attorneys' fees, costs, and interest.

## THIRD CAUSE OF ACTION

## COPYRIGHT INFRINGMENT

143.    Plaintiffs re-allege every paragraph set forth above as though set forth herein.

144.    The Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 101–803, grants copyright owners a bundle of exclusive rights, including the rights to "reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." *Id.* § 106.

145.    "Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir.1997); *see Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

146.    There are two main components of this *prima facie* case of infringement: "a plaintiff must first show that his work was actually copied .... [and] then must show that the copying amounts to an improper or unlawful appropriation." *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139–40 (2d Cir.1992) Castle Rock Entertainment, Inc. v Carol Pub. Group, Inc., 150 F3d 132, 137 [2d Cir 1998]

147.   Plaintiffs' photographs used by Defendants in thousands of fraudulent profiles are copyrighted with the U.S. Office of Copyrights in Washington D.C., entitling Plaintiffs to statutory damages of $750.00 to $30,000 for each act of infringement, and up to $150,000 per act for intentional infringement.

148.   Photographs of numerous class members have been copyrighted as well.

149.   Defendants have derived a majority of their $3 billion in gross revenue during the class period from the unauthorized use of Plaintiffs' and the classes' copyrighted photographs, entitled Plaintiffs' to a majority of Defendants' gross revenue during that period.

150.   When Raquel Welch's photograph was published on a magazine cover for Celebrity Skin without authorization, she received 50% of the profits derived therefrom: "In our view the highest percentage of sales and hence profits attributable to the cover photograph in this case which the district court could reasonably and correctly have awarded would be 50%. We therefore find that damages are $25,697.75, which is 50% of $51,395.50, the amount of profits. Sygma Photo News, Inc. v High Soc. Mag., Inc., 778 F2d 89, 96 [2d Cir 1985]

151.   In addition to Defendants knowing and intentional complicity with copyright infringement, Defendants engagement in "Willful Blindness."

152.   "The principle that willful blindness is tantamount to knowledge is hardly novel." *Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 110 n. 16 (2d Cir.2010) (collecting **35** cases); *see In re Aimster Copyright Litig.,* 334 F.3d 643, 650 (7th Cir.2003) ("Willful blindness is knowledge, in copyright law ... as it is in the law generally.").

153.   A person is "willfully blind" or engages in "conscious avoidance" amounting to knowledge where the person " 'was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.' " *United States v. Aina-Marshall,* 336 F.3d 167, 170

(2d Cir.2003) (quoting *United States v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993)); *cf. Global–Tech Appliances, Inc. v. SEB S.A.,* —— U.S. ——, 131 S.Ct. 2060, 2070–71, 179 L.Ed.2d 1167 (2011) (applying the willful blindness doctrine in a patent infringement case).

154.     Writing in the trademark infringement context, we have held that "[a] service provider is not ... permitted willful blindness. When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way." *Tiffany,* 600 F.3d at 109. <u>Viacom Intern., Inc. v YouTube, Inc.,</u> 676 F3d 19, 34-35 [2d Cir 2012]

155.     Accordingly, we hold that the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA. <u>Viacom Intern., Inc. v YouTube, Inc.,</u> 676 F3d 19, 35 [2d Cir 2012]

156.     All persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers. *See, e.g., Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 308–09 (2d Cir.1963); 3 M. Nimmer, *Nimmer on Copyright* § 12.04[A], at 12–34 (1985). <u>Sygma Photo News, Inc. v High Soc. Mag., Inc.,</u> 778 F2d 89, 92 [2d Cir 1985]

157.     Where "there is a class of primary infringers," a party "may be held liable as a contributory infringer" when, "with knowledge of the infringing activity, [it] induces, causes, or materially contributes to the infringing conduct of another." *Matthew Bender & Co., Inc. v. West Publ'g Co.,* 158 F.3d 693, 706 (2d Cir.1998).

158.     "[A]ctivities that lead to contributory liability are (i) personal conduct that encourages or assists the infringement; and (ii) provision of machinery or goods that facilitate the

infringement." *Matthew Bender*, 158 F.3d at 706. A party is liable for vicarious infringement if it "had a right and ability to supervise that coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir.1997).Agence France Presse v Morel, 769 F Supp 2d 295, 304 [SDNY 2011]

159.   Defendants are not entitled to protection of the Digital Millennium Copyright Act because the DMCA safe harbor at issue in this matter requires that the party seeking the benefit of the safe harbor (1) lack knowledge or awareness that the material at issue is infringing, lack awareness of facts or circumstances from which infringing activity is apparent, and act expeditiously to remove material known to be infringing upon obtaining such knowledge; and (2) not receive a financial benefit directly attributable to the infringing activity. 17 U.S.C. § 512(c)(1); *see also Viacom*, 676 F.3d at 36. Agence France Presse v Morel, 934 F Supp 2d 547, 568 [SDNY 2013] reconsideration granted in part, 934 F Supp 2d 584 [SDNY 2013]

160.   Since Defendants have had actual awareness of infringement and have profited directly from such infringement, they are not entitled to safe harbor under the DMCA.

161.   Lastly, Defendants failed to comply with the requirements of § 512(i), which conditions safe harbor eligibility on the service provider having "adopted and reasonably implemented ... a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). Viacom Intern., Inc. v YouTube, Inc., 676 F3d 19, 40 [2d Cir 2012]

162.   Since Defendants openly allow the Yahoo Boys and other third party criminals to create millions of fake profiles on Defendants' web sites with Plaintiffs' copyrighted photographs

over a six year period from Yahoo email addresses pinging from dedicated IP address in Nigeria and Ghana and other international locations without penalty for repeat infringers, Defendants are ineligible for the safe harbor provision of the DMCA.

163.   WHEREFORE, Plaintiffs and the class request equitable relief requiring Defendants to screen their site against copyrighted photographs of Plaintiffs and those of the class, along with profits attributable to the use of Plaintiffs photographs and those of the class, or statutory damages, whichever is greater, together with attorneys' fees and the costs of this action.

## FOURTH CAUSE OF ACTION

## VIOLATIONS OF NY CIVIL RIGHTS LAW – ARTICLE 5 (RIGHT OF PRIVACY)

164.   Plaintiffs re-allege every paragraph set forth above as though set forth herein.

165.   New York Civil Rights Law Section 50 states: "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name portrait or picture of any living person without having first obtained the written consent of such person… is guilty of a misdemeanor."

166.   New York Civil Rights Law Section 51 states: "(A)ction for injunction and for damages…" may be brought under this law and that, "the jury, in its discretion, may award exemplary damages," if such photographs were, "knowingly used."

167.   Defendants individually, and/or by their partners, subcontractors, or agents, knowingly develop, approve, post, publish, and disseminate Melissa Midwest's photographs (plus thousands of class member photographs) to millions of consumers throughout the United States without  permission or consent in fraudulent dating profiles and in marketing and advertising materials.

168.    Match has actual and constructive knowledge that such photographs are used without the permission or consent of Plaintiff and others depicted in these photographs, as evidenced by the consumer complaints attached hereto, and the fake Match profiles attached hereto, particularly those published after this lawsuit was filed.

169.    Plaintiffs and the class seek compensatory damages in the amount of $1.5 billion plus punitive damages in the amount of $3 billion, to punish Defendants for their illegal practices and to deter such conduct in the future, together with attorney's fees and the costs of this action.

## FIFTH CAUSE OF ACTION

## CONVERSION

170.    Plaintiffs re-allege every paragraph set forth above as though set forth herein.

171.    To establish a claim of conversion, a plaintiff "must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question ... to the exclusion of the plaintiffs rights." *Fiorenti v. Central Emergency Physicians, PLLC*, 305 A.D.2d 453, 454–55, 762 N.Y.S.2d 402 (N.Y.App.Div.2003).

172.    "(C)onversion requires a showing of plaintiffs ownership or legal right to possession of specific, identifiable property at the time of the alleged conversion and a showing that the defendant wrongfully took possession of the property thereby depriving the plaintiff of its right to possession. *See* 18 Am.Jur.2d Conversion § 2 (2008). Berman v Sugo LLC, 580 F Supp 2d 191, 206 [SDNY 2008]

173.    By approving, posting, and publishing Plaintiffs' photographs in thousands of Match's online dating profiles, Match converted the intellectual property of Plaintiffs to their own, depriving Plaintiffs of their right to possession as well as members of the class.

174.    Wherefore, Plaintiffs and the class request that all photographs of themselves be returned to Plaintiffs, and that compensatory damages be granted to Plaintiffs and the class at the time of trial along with attorneys' fees and the costs of this action.

## SIXTH CAUSE OF ACTION

## AIDING AND ABETTING FRAUD

175.    Plaintiffs re-allege every paragraph set forth above as though set forth herein.

176.    To establish liability for aiding and abetting fraud, the plaintiffs must show "(1) the existence of a fraud; (2)[the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *JP Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247, 252 (S.D.N.Y.2005) (internal quotation marks and citations omitted); *see also Franco v. English,* 210 A.D.2d 630, 633, 620 N.Y.S.2d 156, 159 (3d Dep't 1994) (requiring "nexus between the primary fraud, [defendant's] knowledge of the fraud and what it did with the intention of advancing the fraud's commission"). Lerner v Fleet Bank, N.A., 459 F3d 273, 292 [2d Cir 2006]

177.    The leading opinion interpreting New York law in this respect is *Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240 (S.D.N.Y.1996), in which Judge Mukasey concluded that "[t]ogether, *H2O Swimwear*[*Ltd. v. Lomas,* 164 A.D.2d 804, 560 N.Y.S.2d 19 (1st Dep't 1990),] and *AA Tube Testing* [*Co. v. Sohne,* 20 A.D.2d 639, 246 N.Y.S.2d 247 (2d Dep't 1964),] demonstrate that actual knowledge is required to impose liability on an aider and abettor under New York law." *Id.* at 246, 246 N.Y.S.2d 247; *see also JP Morgan Chase Bank,* 406 F.Supp.2d at 252 n. 4 ("[T]he weight of the case law ... defines knowledge in the context of an aiding and abetting claim as actual knowledge."). Lerner v Fleet Bank, N.A., 459 F3d 273, 292 [2d Cir 2006]

178.     Defendants have had actual knowledge for the past six years that criminals in Nigeria, Ghana, Russia, and other countries have been using photographs of Plaintiffs and thousands of class members in fake profiles on their web sites.

179.     Defendants have grossed approximately $3 billion during the class period, in large part due to unauthorized publication of photographs as false advertising in millions of fake Match.com and People Media dating profiles.

180.     While the oceans provide a natural body of protection for American citizens, the only way American can be protected on the internet is through IP address screening to ensure that a profile designating the United States as its origin was created in the United States, and not on a laptop in Nigeria or through a notorious proxy server.

181.     Defendants have actual knowledge that the IP addresses for hundreds of Plaintiffs' profiles ping from international locations or notorious proxy servers.

182.     Defendants accept subscription fees from international individuals and entities who join Defendants' dating sites for the sole purpose of perpetuating romance scams or other consumer fraud.

183.     Defendants' acts of hosting third-party criminals' profiles and allowing them to communicate on Defendants' sites provides "substantial assistance" to the fraud's commission.

184.     As a result of the foregoing, Plaintiff and the class have been damaged in the amount of $1.5 billion, and request $3 billion in punitive damages, to punish the Defendants and deter such conduct in the future.

## SEVENTH CAUSE OF ACTION

## VIOLATIONS OF COMMON LAW RIGHT OF PUBLICITY

185.     Plaintiffs re-allege every paragraph set forth above as though set forth herein.

186.     This Circuit has long held that New York recognizes the common law property right of publicity in addition to, and distinct from, the statutory right under s 51. Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir.), cert. denied, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); Groucho Marx Productions, Inc. v. Playboy Enterprises, Inc., supra, at 9; Factors Etc., Inc. v. Creative Card Co., No. 77-4400, 444 F.Supp. 279 (S.D.N.Y.1977), at 7-12; Price v. Hal Roach Studios, Inc., 400 F.Supp. 836, 843-44 (S.D.N.Y.1975); Grant v. Esquire, Inc., supra, 367 F.Supp. at 879-80; Booth v. Colgate-Palmolive Co., 362 F.Supp. 343, 347 (S.D.N.Y.1973); Chaplin v. National Broadcasting Co., 15 F.R.D. 134, 139-40 (S.D.N.Y.1953). See also Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977); Cepeda v. Swift & Co., 415 F.2d 1205 (8th Cir. 1969); Ettore v. Philco Television Broadcasting, 299 F.2d 481 (3rd Cir. 1956); Uhlaender v. Henricksen, 316 F.Supp. 1277 (D.Minn.1970). Ali v Playgirl, Inc., 447 F Supp 723, 728 [SDNY 1978]

187.     Plaintiff Melissa Midwest has a right to publicity interests in the use of her likeness and image.

188.     The unauthorized use of their likeness and image on Defendants' web sites has caused damage to Plaintiffs.

189.     Plaintiff and members of the class have been falsely stigmatized as "dating scammers" when in fact Melissa Harrington is an innocent victim of identity theft.

190.     Wherefore, Plaintiff and the class request compensatory damages in an amount to be determined at trial, together with attorneys' fees and the costs of this action.

## EIGTH CAUSE OF ACTION

## NEGLIGENCE

191.     Plaintiffs re-allege every paragraph set forth above as though set forth herein.

192.     To establish a prima facie case of negligence under New York law, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon ex rel. Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294, 499 N.Y.S.2d 392, 392 (1985); *see also King v. Crossland Sav. Bank,* 111 F.3d 251, 259 (2d Cir.1997). Lerner v Fleet Bank, N.A., 459 F3d 273, 286 [2d Cir 2006]

193.     Defendant IAC/INTERACTIVECORP., as a publicly traded corporation, owes a duty of reasonable care to American citizens whose likenesses and images are used on Defendants' web sites without consent.

194.     Defendants have had actual and constructive knowledge since at least November 21, 2007, that the likeness and image of Plaintiff and other class members were and are being used on Defendants' web sites in millions of fraudulent profiles.

195.     Defendants have failed to use reasonable care in screening fraudulent profiles on Defendants' sites that incorporate the likeness and image of Plaintiff and members of the class.

196.     Defendants have failed to use reasonable care in screening IP addresses from international locations and notorious proxy servers from creating fake or fraudulent profiles on Defendants' sites, which include the likenesses and images of Plaintiff and other class members.

197.     Defendants have failed to screen fake profiles that contain recurring phrases, sentences, and paragraphs of text that are copied again and again, all of which contain unauthorized publications of Plaintiff and class member photographs.

198.     As a result of Defendants' lack of reasonable care and willful blindness, the likenesses and images of Plaintiff and members of the class have been used in millions of

fraudulent profiles, benefiting Defendants through increased subscription and advertising revenues.

199.   As a result of Defendants' negligence, Plaintiff and the class have suffered damages stemming from the unauthorized use of their photographs.

200.   Damages include but are not limited to damages to reputation and loss of earning potential.

201.   Wherefore, Plaintiff and the class request compensatory damages in the amount of $1.5 billion, together with attorneys' fees and the costs of this action.

## NINTH CAUSE OF ACTION

## COMMON LAW UNFAIR COMPETITION - MISAPPROPRIATION

202.   Plaintiffs re-allege every paragraph set forth above as though set forth herein.

203.   The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980)

204.   Unfair competition is a "broad and flexible doctrine" that encompasses an "incalculable variety of illegal practices." *Roy Export Co. Establishment v. Columbia Broad. Sys. Inc.*, 672 F.2d 1095, 1105 (2d Cir.1982)

205.   Courts have described unfair competition as " 'misappropriat[ing] for the commercial advantage of one person ... a benefit or 'property' right belonging to another.' " *Roy Export Co. Establishment*, 672 F.2d at 1105 (quoting *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 492 (N.Y.Sup.Ct.1950)); *see also Laser Diode Array, Inc. v. Paradigm Lasers, Inc.*, 964 F.Supp. 90, 95 (W.D.N.Y.1997) ("Misappropriation of another's commercial advantage [is] a cornerstone of the tort.").

Importantly, a claim of unfair competition must involve "some element of bad faith." *Saratoga Vichy Spring Co.*, 625 F.2d at 1044.  Berman v Sugo LLC, 580 F Supp 2d 191, 208-09 [SDNY 2008]

206.    Defendants have misappropriated the intellectual property of Plaintiffs and the class for commercial advantage.

207.    Defendants' web sites have estimated that profiles with photographs are 15 x more likely to be viewed than those without photographs.

208.    Therefore, it is the photographs in the fake profiles that draw the member/subscriber to the profile, keep them on the web site, entice them to correspond, and potentially renew their membership and/or recommended the site.

209.    Plaintiffs and the class own the intellectual property rights to their photographs and the use of them by Defendants in millions of fake dating profiles constitutes misappropriation.

210.    Wherefore, Plaintiff requests damages in the amount of profits earned as a result of the unauthorized use of Plaintiff's photographs in fake profiles approved and posted on Defendants' dating web sites.

## TENTH CAUSE OF ACTION

## UNJUST ENRICHMENT

211.    Plaintiffs re-allege every paragraph set forth above as though set forth herein.

212.    To state a claim for unjust enrichment, a Plaintiff must prove that; (1) Defendant was enriched; (2) the enrichment was at Plaintiff's expense; (3) the circumstances were such that equity and good conscience require Defendant to make restitution.

213.     Defendants' unauthorized commercial use of photographs depicting the likenesses and images of Plaintiff and members of the class in millions of fraudulent profiles has resulted in gross earnings of approximately $3 billion during the class period.

214.     Plaintiff and members of the class essentially serve as the unpaid models, advertisers, and marketers of Defendants' web sites, as they appear in thousands of fraudulent profiles every day, enticing new subscribers to join and old subscribers to renew, as well as generating millions of dollars in advertising revenue.

215.     A majority of Defendants' gross earnings in its "Match Segment" is derived by and through the unauthorized use of photographs depicting the likenesses and images of Plaintiff and members of the class.

216.     Since a majority of the photographs used on Defendants' sites include the unauthorized use of Plaintiff's likeness and image as well as members of the class, Plaintiffs' and the class request that they receive a majority of the net earnings of IAC during the class period from their Match Segment, as this was derived largely as a result of the use of the likeness and images of Plaintiff and the class without authorization or compensation.

217.     Defendants have been unjustly enriched in excess of $1.5 billion.

218.     Since this money was obtained through a fraudulent enterprise, equity and good conscience require that restitution be made to Plaintiffs and the class for the unauthorized use of their photographs.

219.     As enrichment was at the expense of Plaintiffs and the class, equity requires that Plaintiffs and the class be compensated by receiving a majority of the net profit realized through IAC's "Match Segment" during the class period.

220.    Wherefore, Plaintiffs and the class request restitution in an amount of $1.5 billion for Unjust Enrichment occurring during the class period, together with attorneys' fees and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.    Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiffs as representatives of the class;

B.    Granting injunctive relief requiring Defendants to implement photograph and facial recognition software to screen  the unauthorized use of Plaintiffs' and class members' photographs from publication on Defendants' web sites;

C.    Declaring that Defendants violated the Lanham Act by passing off Plaintiffs and members of the class as genuine members of Defendants' sites;

D.    Declaring that Defendants violated Civil RICO and by developing, creating, approving, posting,  publishing, and disseminating millions of fraudulent profiles on their web sites incorporating the unauthorized use of Plaintiffs' photographs and members of the class.

E.    Declaring that Defendants committed Copyright Infringement.

F.    Declaring that Defendants violated New York Civil Rights Law Section 50 and 51.

G.    Issuing injunctive relief requiring Defendants to screen foreign IP addresses from creating domestic dating profiles in the United States;

H.    Awarding compensatory damages to Plaintiffs and the class in amount not less than $1.5 billion;

I.      Awarding treble and/or punitive damages to Plaintiffs and the class in an amount

not less than $3 billion;

J.      Awarding attorneys' fees and costs to Plaintiffs and the class;

K.      Granting such other and further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs and members of the class demand a trial by jury of all issues so triable.

Dated:  January 27, 2014

New York, New York

Respectfully submitted:

By:

Evan Spencer
Attorney at Law
305 Broadway, 14th Floor
New York, NY   10007
Tel. 347.931.1814
Fax  347.402.7991
EvanSpencerEsq@aol.com

*Counsel for Plaintiffs and the Proposed Class*